IN THE COURT OF APPEALS OF TENNESSEE

AT KNOXVILLE

FILED

January 29, 1999

Cecil Crowson, Jr.
Appellate Court
Clerk

| | | |
|---|---|---|
| JOSEPH RAY SIMMONS, | ) | C/A NO. 03A01-9805-CV-00158 |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | APPEAL AS OF RIGHT FROM THE |
| v. | ) | BRADLEY COUNTY CIRCUIT COURT |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| TONYA MICHELLE SIMMONS, | ) | |
| | ) | HONORABLE LAWRENCE H. PUCKETT, |
| Defendant-Appellee. | ) | JUDGE |

For Appellant                           For Appellee

JIMMY W. BILBO                          RANDY SELLERS
Logan, Thompson, Miller, Bilbo,         Cleveland, Tennessee
 Thompson & Fisher, P.C.
Cleveland, Tennessee

O P I N I O N

REVERSED AND REMANDED                              Susano, J.

This is a post-divorce proceeding concerning the custody of Colby Curtis Ray Simmons ("Colby") (DOB: March 25, 1991). The trial court awarded "primary physical custody" of Colby to the child's mother, Tonya Michelle Cawood, formerly Simmons ("Mother"), thereby modifying the divorce judgment that had granted this custodial role to the boy's father, Joseph Ray Simmons ("Father"). The Court did not disturb its previous grant of joint legal custody. Father appeals, arguing that the trial court misinterpreted the principles enunciated by the Supreme Court in *Aaby v. Strange*, 924 S.W.2d 623 (Tenn. 1996), and that the evidence preponderates against the trial court's determination that Father's move from White, Georgia, to Somerset, Kentucky, was prompted by vindictiveness on his part.

I.

The parties' marriage was dissolved by final judgment entered May 19, 1994. The judgment incorporates a marital dissolution agreement ("MDA") executed by the parties on February 8 and 9, 1994. The MDA vested the parties with joint legal custody of Colby. While it did not specifically award residential custody of Colby to Father, it is clear from the tenor of the MDA that this is what the parties intended, a fact acknowledged by Mother throughout these proceedings.

The MDA includes the following provision:

> [Father] and the child shall have the right to live in within a seventy-five mile radius of Bradley County, Tennessee. Each party shall provide transportation of either

2

> picking up the child or delivering the child
> to the other party.

Additionally, the MDA provides that Mother is to have visitation "on alternating weekends from 5:00 p.m. Friday until 6:00 p.m. Sunday," as well as summer visitation and visitation on specified holidays.

In or around August, 1996, Father moved with Colby and his new wife to White, Georgia, to take a position as an elementary school teacher with the Bartow County, Georgia, school system. His residence was within the required 75-mile radius of Bradley County. He taught in Bartow County for one school year. During that year, sometime in or around February, 1997, he learned that his contract would not be renewed for the next school year. He received written notification of this fact on April 15, 1997.

Father and his wife had purchased a home in White, Georgia. It was their desire to remain in that locale. Accordingly, upon learning that his teaching contract was not going to be renewed, Father applied for a teaching position in four Georgia counties: Bartow, Cherokee, Gordon, and Cobb. He was not successful in securing a position in Georgia. Had he obtained employment in any of these counties, he would have continued to reside within the 75-mile radius restriction. He testified that he did not make a new application for employment in the Bradley County or Cleveland school systems because "me and Ms. Cawood are not able to live in the same town without me being badgered a lot, so I did not really want to move back to

3

Cleveland." Even at that, he stated that prior to going to Georgia, he had applied to the two Tennessee school systems; that he assumed his applications were still on file; and that he would have accepted a job there "if I had an offer." He reiterated that his desire was to stay in Georgia "where we were purchasing the home."

Father did not receive any job offers in Georgia; but in June, 1997, he learned of a fifth-grade teaching position in Pulaski County, Kentucky, some 200 miles from Bradley County. He accepted this position and moved to Somerset, Kentucky. His new wife's parents -- her father is a minister who pastors a church in the area -- live in an adjoining county.

On June 19, 1997, Father filed a petition seeking to be relieved of the 75-mile radius restriction so as to facilitate his move, with Colby, to Somerset. Mother filed an answer and counterclaim, denying that Father was entitled to relief with respect to the restriction. In her counterclaim, she sought sole custody or, in the alternative, primary physical custody. The gravamen of her counterclaim is found in the following allegations:

> [Mother] avers that the move requested by [Father] in this matter, is a material change of circumstances, entitling [Mother] to ask this court to modify the marital dissolution agreement entered into by the parties, and to award full custody, or at least exclusive physical custody, of the parties' minor child to [her].
>
> [Father's] frequent moves and inability to maintain steady employment indicate a lack of responsibility necessary for the successful

4

> raising of a child. Further, the frequent,
> almost nomadic, movement by [Father] is
> detrimental to the child's mental, emotional,
> and physical well being.
>
> The majority of the minor child's family
> resides in Cleveland, Tennessee or in the
> state of Georgia. Awarding custody to
> [Mother] would be in the best interest of the
> minor child.

The parties' competing claims were heard by the trial court on January 21, 1998, following which the court ordered that Mother be designated as "primary physical custod[ian]," with custody to be transferred at the end of the 1997-1998 school year. The rationale for the court's decision is found in its opinion orally rendered from the bench:

> COURT: Well, it's a real difficult case. I
> think it was a difficult case all along from
> reading the file.
>
> Back in March when joint custody was granted
> by the Court I think the Court looked at the
> parties and found both of them fit persons to
> have custody. And I believe the marital
> dissolution agreement, of course, it's merged
> into the order of the Court and it was made a
> part of the court, the 75-mile radius
> requirement, so I believe the Court in making
> this joint custody contemplated that that
> wouldn't change. That order didn't foresee
> that we'd be trying to operate with joint
> custody with primary physical custody with
> the father going beyond the 75-mile radius,
> but it's happened in this case.
>
> I think there's proof of vindictiveness
> insofar as -- I think vindictive is a very
> difficult word, a hard word. It would not be
> something I would normally apply to Mr.
> Simmons. But if vindictiveness means the
> desire to go against the Court's prior orders
> of joint custody, at least the spirit of a
> joint custody agreement, and if it means to
> defeat the noncustodial parent's rights to
> visitation and closeness to the child, at
> least to be within a certain mile radius,
> then I think the fact that he has said that

5

he did not want to be close, he didn't want to move any closer to you, meets that definition of vindictive.

And this child needs to be in an environment, in the most stable environment, for its own best interest. And any time any changes are made it's going to be disruptive for the short term but the Court's convinced that in the long term the stability of the child and the best interest of the child would be served by a change of primary physical custody to the mother.

II.

In the 1996 case of **Aaby v. Strange**, 924 S.W.2d 623 (Tenn. 1996), the Supreme Court revisited its 1993 decision in **Taylor v. Taylor**, 849 S.W.2d 319 (Tenn. 1993). The Court stated that it wanted to "dispel the ambiguity of **Taylor** and clarify its impact on the law of removal." **Aaby**, 924 S.W.2d at 629. In **Taylor**, the Supreme Court had attempted to "make determinate an area of the law that ha[d] become increasingly unsettled," *id*. at 326, *i.e.*, the removal of a minor child by a custodial parent to a locale away from that of the non-custodial parent. The **Taylor** Court had held that relocation, standing alone, was not a sufficient basis for a change of custody. **Id.** at 332.

As the **Aaby** case points out, the Supreme Court in **Taylor**

was fundamentally concerned with furthering two overarching goals in the law of removal: *(1) "limiting judicial intervention in post-divorce family decision-making, and (2) making disputes easier of resolution if they must be litigated."*

6

*Aaby*, 924 S.W.2d at 629 (quoting from *Taylor*, 849 S.W.2d at 331) (emphasis in *Aaby*). Because the Supreme Court decided that "[t]he ultimate message to be gleaned from *Taylor* is admittedly obscure," *Aaby,* 924 S.W.2d at 629, it granted the petition of the custodial mother in *Aaby* for permission to appeal so that it could once again address the subject of removal.

In *Aaby*, the Supreme Court substantially limited the circumstances under which a non-custodial parent could prevent removal *or* secure a change of custody based solely upon the planned removal of a minor child. The crux of the holding in *Aaby* is found in the following language from that opinion:

> ...we conclude, as the mother insists, that a custodial parent will be allowed to remove the child from the jurisdiction unless the non-custodial parent can show, by a preponderance of the evidence, that the custodial parent's motives for moving are vindictive -- that is, intended to defeat or deter the visitation rights of the non-custodial parent.
>
> This conclusion does not mean, however, that a non-custodial parent's hands are tied where removal could pose a specific, serious threat of harm to the child. In these situations, the non-custodial parent may file a petition for change of custody based on a material change of circumstances. The petition would state, in effect, that the proposed move evidences such bad judgment and is so potentially harmful to the child that custody should be changed to the petitioner. Because Tennessee law allows custody to be changed if the behavior of the custodial parent clearly posits a danger to the physical, mental or emotional well-being of the child, *Musselman v. Acuff*, 826 S.W.2d 920 (Tenn.App. 1991), such a petition would not violate *Taylor* -- which only prohibits a change of custody based *solely on the fact of the move*.

7

*Id.* at 629-630 (footnote omitted)(emphasis in *Aaby*).

III.

As a threshold determination, we must decide if there are factual differences between the instant case and **Aaby** which impact how -- if at all -- the precedent of that case is applicable to the facts of this case. Without question, there are factual differences -- two of which are arguably pertinent to the question now under consideration. In the instant case, the trial court was faced with a joint custody decree, while the Court in **Aaby** was confronted with a decree of sole custody. Furthermore, the instant case involves a specific provision limiting the primary custodian's place of residence to the area within a 75-mile radius of Bradley County. The judgment in **Aaby** contained no such limitation. **Aaby**, 924 S.W.2d at 624. We will address these two factual differences in reverse order.

IV.

We do not believe that the 75-mile radius restriction is an impediment to the applicability of the **Aaby** principles and procedures to the facts of this case. In **Taylor**, the Supreme Court attempted to comprehensively address the issue of removal. In doing so, the Court even addressed how a court should view an order that prohibits or restricts relocation, *even though there was no such provision in the* **Taylor** *case*. Since the Court in **Aaby** intended to refine, and untangle the ambiguity in, the holding in **Taylor**, it is logical to assume that the **Aaby** Court would have stated that its holding was not applicable to cases with prohibitory language had it so intended. It did not so

9

state.  We conclude from this that the *Aaby* Court intended that the principles and procedures enunciated in that case would apply to cases with prohibitory provisions as well as to those cases without such provisions.

It is clear from the *Aaby* opinion that the Supreme Court intended to cover the entire spectrum of removal cases. While an appellate court's decision must be read in the context of the facts of the case, *see National Life & Accident Ins. Co. v. Eddings*, 221 S.W.2d 695, 699 (Tenn. 1949), we cannot ignore a broad pronouncement by the Supreme Court, especially one that is obviously designed to cover, and clarify, the totality of an area of the law.  *See Holder v. Tennessee Judicial Selection Commission*, 937 S.W.2d 877, 881-82 (Tenn. 1996).

V.

As to the argument that *Aaby* is not applicable to a joint custody arrangement where one parent is the residential custodian and the other has visitation rights, that position was considered by us and rejected in *Perry v. Perry*, 943 S.W.2d 884 (Tenn.App. 1996).  In that case, Judge Lillard, speaking for the Court, said the following:

> Father attempts to distinguish *Aaby* by arguing that the custodial parent in that case had *sole* custody, while the parties in this case have joint custody, with Mother having primary physical custody.  This is a distinction without a difference.

10

*Id*. at 886.  (emphasis in *Perry*).  We adhere to our holding in

*Perry*.  *Aaby* is controlling here; hence, the procedures and

principles set forth in *Aaby* control the disposition of this

appeal.[1]


                              VI.


        It is clear to us that Mother's counterclaim for change

of custody was prompted by, and is essentially based upon, the

fact that Father was planning to relocate to Kentucky.[2]  The

trial court so treated it, and we believe this is the proper

interpretation of the issues made by the pleadings.


        In general terms, *Aaby* focuses on two aspects of a

planned move: the relocating parent's *motive* in moving and

whether the proposed move "could pose a *specific, serious* threat

of harm to the child."  *Aaby,* 924 S.W.2d at 629.  (emphasis

added).  In the instant case, Mother did not allege, nor did the

proof show, the type of specific, serious threat of harm

contemplated by *Aaby*.  Thus, the narrow question for us is

whether Father's motive for relocating -- the reason for his move

from Georgia to Kentucky -- was "to defeat or deter the

visitation rights of" Mother.  *Id*.  The question is not whether

_____

        [1]After this case was heard and decided on January 21, 1998, with an
order entered February 18, 1998, confirming the change of custody, the
legislature enacted Chapter 910, Public Acts of 1998, with an effective date
of May 7, 1998.  That Chapter is now codified at T.C.A. § 36-6-108.  That Act
is not applicable to this case and has not been considered by us.

        [2]Mother makes a general reference in her counterclaim to Father's
frequent moves and "inability to maintain steady employment."  The evidence
regarding his moves is, at best, inconclusive.  Her allegation with respect to
Father's employment is not substantiated by the proof.  In any event, there
was absolutely no proof that Colby was adversely affected by any of this.

11

the planned move will adversely affect Mother's visitation rights. Such moves frequently do; rather, the real question is whether Father's motive -- his state of mind -- was to defeat or deter Mother's visitation with Colby.

VII.

Father's motive for relocating must be viewed in the context of his circumstances. He received his degree from Lee College subsequent to the parties' divorce. His teaching job in Georgia was his first position in his new profession. He first learned in or around February, 1997, that his teaching contract was not going to be renewed. Father testified that most teaching positions for the next school year had already been filled by that time of the year. When the school term ended in the May-June, 1997, time frame, Father was facing the prospect of supporting his wife and Colby in a new house with no job and only one year's experience in his chosen profession.

It is reasonable to assume that Father decided to move to Kentucky because he needed a job. The teaching position in that state had the added advantage of placing Father and his family near his in-laws. There was absolutely no proof that Father had other job opportunities in Georgia, Tennessee, or elsewhere when he decided to move to Kentucky.

It is important to note that, prior to the move, Father had afforded Mother *more,* rather than less, visitation than was required by the trial court's judgment. From the time of the

12

divorce until March, 1995, Father and Mother alternated *weeks* with their minor child.  Since the move to Kentucky, there had been only two occasions when Father was unable to strictly comply with Mother's every-other-weekend entitlement.  On both occasions, Father gave Mother other days of visitation to make up for the missed days.

The trial court admitted that the word "vindictive" was not a word that it would normally apply to Father.  However, it then concluded that the "definition of vindictive" was met in this case because Father went "against the Court's prior orders of joint custody, at least the spirit of a joint custody agreement."  He further found that Father was "vindictive" in not desiring to live in Mother's county of residence.  With all due respect to the trial court, this is not the issue.  The issue, under the teachings of **Aaby**, is whether the relocating parent's *motive* for the move is to defeat or deter the other parent's visitation rights.  The preponderance of the evidence in this case is that Father's motive for moving outside the area encompassed in a 75-mile radius of Bradley County was to pursue gainful employment.  There is nothing about his actions or words to indicate that he wanted to hinder Mother's visitation rights. On the contrary, the record is replete with evidence that Father has fostered Mother's time with Colby.  This Court finds particularly significant the fact that Father voluntarily split the child's time equally with his former wife for a period of 10 months immediately following the divorce even though Mother was only entitled under the trial court's judgment to every-other-weekend visitation.

In the final analysis, we find that the evidence preponderates against the trial court's judgment changing the custodial arrangement that existed prior to the order of February 18, 1998.  *See* Rule 13(d), T.R.A.P.

The judgment of the trial court is reversed.  This matter is remanded to the trial court for the entry of an order consistent with this opinion.  The order will provide that the physical custody of Colby will be transferred to Father within one week of the end of the 1998-1999 school year.  Costs on appeal are taxed against the appellee.

_____
Charles D. Susano, Jr., J.

CONCUR:


_____
Houston M. Goddard, P.J.


_____
William H. Inman, Sr.J.