Janice HOLDER, Plaintiff/Appellee,

v.

TENNESSEE JUDICIAL SELECTION COMMISSION and George T. Lewis, III, Esq., In his Official Capacity as Chairperson of the Tennessee Judicial Selection Commission, Defendants/Appellants.

Supreme Court of Tennessee, at Nashville.

Oct. 23, 1996.

Rehearing Denied Dec. 2, 1996.

Paul C. Ney, Jr., Gregory Mitchell, Doramus & Trauger, Nashville, for Defendants/Appellants.

Jef Feibelman, Susan Clark, Burch, Porter & Johnson, Memphis, and John A. Day, Branham & Day, Nashville, for Plaintiff/Appellee.

## OPINION

ANDERSON, Justice.

We granted this expedited appeal to determine a question of unusual public importance—whether the issue considered in part VI of the Special Supreme Court's October 2, 1996 opinion [1], the residency requirements for the current Supreme Court vacancy, was before that Court for determination. That question is presented in this case. Consequently, if the Special Supreme Court did not have subject matter jurisdiction of that issue, it must be resolved in this proceeding.

Prior to the release of the Special Supreme Court's opinion, the Tennessee Attorney General had issued an opinion on September 9, 1996, which concluded that residents of both the Eastern and Western Grand Division may apply to the Judicial Selection Commission ("the Commission") to fill the present vacancy on the Tennessee Supreme Court. Based on the Attorney General's opinion, the Commission opened the application process under the Tennessee Plan to residents of both grand divisions.

The Special Supreme Court in part VI of its opinion considered certain post-judgment events and acted on its own motion to rule that the Tennessee Plan residency requirements do not apply under the facts of this case and that other statutes require that the current vacancy be filled by a resident of the Eastern Grand Division.[2] The Davidson County Chancery Court, Part III, held that pronouncement by the Special Supreme Court is *"obiter dictum"* and "not binding." The Chancellor then held that the residency requirement for the vacancy is controlled by the Tennessee Plan, specifically, Tenn.Code Ann. § 17–4–109(f) [3], and that residents of both the Eastern and Western Grand Divi-

---

1. *State ex rel. Hooker v. Thompson,* —— S.W.2d ——, 1996 WL 570090 (Tenn.1996)(No. 01S01–9605–CH00106) (Tenn., filed Oct. 2, 1996, Nashville).

2. *See* Tenn.Code Ann. § 8–48–109 (1993 Repl. and 1996 Supp.); Tenn.Code Ann. § 17–1–301 (1994 Repl. and 1996 Supp.). These general provisions indicate that a vacancy in the Supreme Court shall be filled by a resident of "the grand division of the state in which the vacancy occurs."

3. This provision reads: "The judicial selection commission, in compiling its list of nominees for a supreme court position, shall assure that the requirements of article VI, section 2, of the Tennessee Constitution are satisfied." Article VI, section 2 provides, in relevant part, that "not more than two justices [shall] reside in each grand division."

sions of Tennessee may apply for the vacancy.

We conclude that the Special Supreme Court's ruling regarding the residency requirements for the present vacancy was not before that Court for determination. We also conclude that Tenn.Code Ann. § 17–4–109(f) controls the residency requirements for this vacancy as defined by Article VI, section 2 of the Tennessee Constitution. Accordingly, because two Justices presently reside in the Middle Grand Division, a resident of either the Eastern or Western Grand Divisions of Tennessee may apply for the vacancy.

We therefore affirm the result reached by the Chancellor but for the separate reasons articulated below.

## BACKGROUND

This case arises from a complaint filed in the Davidson County Chancery Court by the plaintiff, Judge Janice Holder, in which she sought injunctive and declaratory relief with respect to her application to be nominated for the current vacancy on the Tennessee Supreme Court. The plaintiff asserted that she was a resident of the Western Grand Division of the state and that she met the qualifications to apply for the position. The complaint alleged that the Commission had erroneously limited its consideration to applicants who were residents of the Eastern Grand Division.

At the Chancery Court hearing, the Commission took a neutral position, stating that it was following the advice of the State Attorney General, who had stated that the Commission should act in accordance with the Special Supreme Court's ruling that the vacancy must be filled by a resident of the Eastern Grand Division.

The parties stipulated that the plaintiff's lawsuit arose from the following events. On May 15, 1996, John Jay Hooker filed a Petition for Writ of Mandamus in the Chancery Court for Davidson County seeking to establish his right to be a candidate in a contested election on August 1, 1996, for the Supreme Court seat then held by Justice Penny White.

Hooker's petition was followed by a similar petition filed by Lewis Laska. After failing to achieve favorable results in the trial court, Hooker and Laska appealed. Because the cases attacked the constitutionality of the statutes governing the manner in which Supreme Court Justices are elected, the members of this Court disqualified themselves from hearing the matter pursuant to Article VI, section 11 of the Tennessee Constitution, and certified that fact to the Governor. Thereafter, the Governor specially commissioned five (5) licensed attorneys to serve as special justices of the Tennessee Supreme Court for the "trial and determination" of the *Hooker* and *Laska* cases.

Prior to the August 1, 1996 election, the Special Supreme Court, acting under severe time constraints, issued a series of orders. It held that the Tennessee Plan[4] for the selection and evaluation of judges was constitutional, but not applicable to the August 1st election because the judicial evaluation commission, through no fault of Justice White, had failed to evaluate or recommend the retention of Justice White in compliance with the provisions of Tenn.Code Ann. § 17–4–114(c). The Special Supreme Court held that although Justice White was not entitled to run in a "yes or no" retention election as provided for under the Plan, she was deemed, as an equitable matter, to have filed a qualifying petition as a candidate for a contested election on August 1, 1996, under the general election laws. The Court further held that John Jay Hooker was not entitled to run against Justice White because his law license had been suspended and that Lewis Laska was not entitled to run against Justice White in a contested election because he was not a resident of the Eastern Grand Division. Finally, because of the prevailing uncertainty regarding the statutory scheme for election of Supreme Court Justices, the Special Supreme Court in another order extended the qualifying deadline to allow independent candidates to file their petitions and party nominees to be certified.

In a later federal court proceeding, however, the United States District Court for the

4. *See* Tenn.Code Ann. § 17–4–101, et seq. (1994 Repl. & 1996 Supp.).

Western District of Tennessee held that Justice White, and other appellate judges who would be affected by the August 1, 1996 election, enjoyed a cognizable constitutionally protected property right in the expectation to run on a "yes or no" retention ballot under the Tennessee Plan, specifically Tenn.Code Ann. § 17–4–114. *Lillard, et al. v. Burson,* 933 F.Supp. 698 (W.D.Tenn.1996). The federal court enjoined the state from taking any action with respect to Justice White's candidacy other than to place her name on the ballot on a "yes or no" retention basis. There was no appeal.

The election proceeded on August 1, 1996, as a retention election under the Tennessee Plan, Tenn.Code Ann. § 17–4–101, et seq. A majority of those casting ballots voted against retaining Justice White as a justice of the Supreme Court, and her term expired on August 31, 1996, pursuant to the provisions of Tenn.Code Ann. § 17–4–112(b). Shortly after the election, the Commission asked the Tennessee Attorney General for an opinion on the residency requirements that applied to the resulting vacancy. In a written opinion issued on September 9, 1996, the Attorney General stated that residents from both the Eastern Grand Division and the Western Grand Division of the state were eligible to apply to fill this vacancy on the Court. Based upon that opinion, the Commission opened the application process to residents of both grand divisions. The plaintiff, Judge Janice Holder, a resident of the Western Grand Division, filed a timely application with the Commission, and a public meeting was scheduled for October 11, 1996, pursuant to the requirements of Tenn.Code Ann. § 17–4–109(a)(2).

On October 2, 1996, the Special Supreme Court issued an opinion explaining its earlier orders. *State ex rel. Hooker v. Thompson,* —— S.W.2d —— (No. 01S01–9605–CH–00106 (Tenn., filed October 2, 1996 at Nashville)). In addition, the opinion contained part VI entitled "Consideration of Post Judgment Facts." *Id.* at —— (slip op. at 19). In that part of the opinion, the Court, purporting to act under the authority of Tenn. R.App. P. 14, took notice of the matters which had occurred after its series of rulings in July 1996, including the case in the federal district court, the election results, and the September 9, 1996 Attorney General Opinion. The Court, acting on its own motion, without the issue having been presented or briefed or orally argued by the interested parties, held that the conclusion of the Attorney General that the vacancy on the Court could be filled by a qualified applicant from either the Eastern or Western Grand Division was erroneous. The Court, relying on Tenn.Code Ann. §§ 17–1–301(b) and 8–48–109, held that the vacancy in question must be filled by a resident of the Eastern Grand Division.

In light of part VI of the Special Supreme Court opinion, the Commission requested a second opinion from the Attorney General regarding the effect of the Opinion on the residency requirement. The Attorney General advised that since "Section VI of the Special Supreme Court's opinion represents the only pronouncement by a court of this State concerning the question addressed therein[,][the Commission] should nominate only applicants who are residents of the Eastern Grand Division to fill the current vacancy on the Tennessee Supreme Court, in accordance with the views expressed [in the Opinion]. . . ." The plaintiff's lawsuit followed. The Chancery Court granted relief by enjoining the Commission from limiting its consideration to applicants who are residents of the Eastern Grand Division, and by ruling that the Commission must consider applicants from either the Eastern or Western Grand Division.

The Commission appealed the Chancery Court's ruling. Both parties thereafter joined in a Motion for the Supreme Court to Assume Jurisdiction pursuant to Tenn.Code Ann. § 16–3–201(d). Because this issue is a matter of unusual public importance in which there is a special need for expedited decision and which involves the right to hold public office, this Court granted the Motion to Assume Jurisdiction and heard oral argument. The public hearing on this matter before the Commission has been reset for October 28, 1996.

### EFFECT OF SPECIAL SUPREME COURT'S RULING

We first consider the Chancery Court's holding that the pronouncement of

the Special Supreme Court in part VI of its October 2, 1996 opinion regarding the residency requirements of the current vacancy on the Supreme Court was *obiter dictum.* The Chancery Court noted that "while [the opinion was] accorded persuasive authority, [it was] not binding on [the] Court."

After a thorough consideration of the issue and the unique facts of this case, we conclude that the residency issue addressed in part VI of the Special Supreme Court's opinion was not before the Court. In sum, it is clear that the pronouncement of the Special Supreme Court in this regard was beyond the mandate for which that Court was commissioned.

After the members of this Court disqualified themselves from participating in the *Hooker* and *Laska* cases, the Governor commissioned the members of the Special Supreme Court to serve as special justices pursuant to Tenn. Const. art. VI, § 11 and Tenn. Code Ann. § 17–2–102. The letter sent by the Governor to each member of the Special Supreme Court specifically limited the mandate of the Special Supreme Court. The letter stated:

> Pursuant to my authority under Article VI, Section 11, of the Constitution of the State of Tennessee, I hereby specially commission you to serve as a special justice of the Tennessee Supreme Court *for the trial and determination of State of Tennessee, ex rel. Hooker v. Thompson, No. 01–S–01–9605–CH–00106 and State of Tennessee, ex rel. Laska v. Thompson, No. 01–S–01–9606–CH–00114.*

(Emphasis added).

The applicable constitutional and statutory provisions limit the commission of a special court to those cases and issues over which the regular members of the court are disqualified from presiding. Article VI, section 11 provides that "in case all or any of the Judges of the Supreme Court shall thus be disqualified from presiding on the trial of any cause or causes, the Court, or the Judges thereof, shall certify the same to the Governor of the State, and he shall forthwith specially commission the [special judges] *for the trial and determination thereof.*" (Emphasis added). Similarly, Tenn.Code Ann. § 17–2–103 provides that "[t]he special judges so

commissioned shall *hear and determine the causes in the commission set forth* ... and shall have the same power and authority in those causes as the regular judges of the court." (Emphasis added). *See also* Tenn. Code Ann. § 17–2–102 ("The judges of the supreme court ... shall certify to the governor all cases ... in which [any] of them is incompetent to sit ... [and] the governor shall appoint and commission the requisite number of competent lawyers to dispose of the causes.").

Thus, the commission of the Special Supreme Court was limited to a "determination" of the *Laska* and *Hooker* cases. Those cases involved the issue of whether the August 1, 1996 election for the Supreme Court position would be a retention or a contested election, and if the election was contested, who was entitled to be a candidate. The orders of the Special Supreme Court issued prior to its opinion addressed matters directly related to these issues. The first five sections of the October 2, 1996 opinion also related to these issues; however, the views expressed in part VI did not relate to the "determination" of the *Laska* and *Hooker* cases. Thus, the pronouncement was beyond the Special Supreme Court's mandate. We note that this Court had the benefit of thorough and extensive briefing of the issues, as well as oral argument, by the interested parties, an advantage that the Special Supreme Court did not have in determining the residency issue.

In view of our holding, we need not decide the question of whether the Special Supreme Court's opinion regarding the residency requirements of the current vacancy was *obiter dictum* and not binding on the trial court as precedent, as found by the Chancellor. We observe, however, that trial courts must follow the directives of superior courts, particularly when the superior court has given definite expression to its views in a case after careful consideration. *Taylor v. Taylor,* 162 Tenn. 482, 488–89, 40 S.W.2d 393, 395 (1931); *Rose v. Blewett,* 202 Tenn. 153, 161–62, 303 S.W.2d 709, 712–13 (1957); *Davis v. Mitchell,* 27 Tenn.App. 182, 223–24,

178 S.W.2d 889, 905–06 (1943)[5]. Accordingly, inferior courts are not free to disregard, on the basis that the statement is *obiter dictum*, the pronouncement of a superior court when it speaks directly on the matter before it, particularly when the superior court seeks to give guidance to the bench and bar. To do otherwise invites chaos into the system of justice.

## RESIDENCY REQUIREMENT

■ The Chancery Court found that the vacancy should be filled pursuant to the provisions of the Tennessee Plan, specifically, Tenn.Code Ann. § 17–4–109(f). This statutory provision states that the judicial selection commission, in compiling a list of nominees for a supreme court position, shall "assure that the requirements of article VI, section 2, of the Tennessee Constitution are satisfied." *Id.* In relevant part, Article VI, section 2 mandates that "not more than two [justices] shall reside in any one of the grand divisions of the State." Thus, the Chancery Court concluded that to comply with the statutory and constitutional provisions, applicants for the current vacancy could reside in either the Eastern or Western Grand Division. We agree.

The Tennessee Plan became effective September 1, 1994. The stated purposes of the Plan were

to assist the governor in finding and appointing the best qualified persons available for service on the appellate courts of Tennessee, and to assist the electorate of Tennessee to elect the best qualified persons to the courts; to insulate the judges of the courts from political influence and pressure; to improve the administration of justice; to enhance the prestige of and respect for the courts by eliminating the necessity of political activities by appellate justices and judges; and to make the courts "nonpolitical."

Tenn.Code Ann. § 17–4–101 (1994 Repl. and 1996 Supp.). The Plan established a Judicial

Selection Commission, whose purpose is to investigate independently and inquire into the qualification of nominees for judicial vacancies which arise after September 1, 1994. Tenn.Code Ann. § 17–4–109(a)(2) & (d). When such vacancies occur, the Commission acts to select the three (3) persons whom the Commission deems the best qualified to fill the vacancy and certifies the names of such persons to the Governor as nominees for the vacancy. Tenn.Code Ann. § 17–4–109(e). Section 17–4–112 of the Code provides that

[w]hen a vacancy occurs in the office of an appellate court after September 1, 1994, by death, resignation *or otherwise*, the governor shall fill the vacancy by appointing one (1) of the three (3) persons nominated by the judicial selection commission. . . .

(Emphasis added). The only limitation on residency requirements within the Tennessee Plan is contained in Tenn.Code Ann. § 17–4–109(f), which provides that

[t]he judicial selection commission, in compiling its list of nominees for a supreme court position, shall assure that the requirements of article VI, section 2, of the Tennessee constitution are satisfied [that is, that not more than two (2) justices reside in each grand division].

*See also* Tenn.Code Ann. § 16–3–101(a)("The supreme court shall consist of five (5) judges, one (1) of whom shall reside in each grand division, and not more than two (2) in the same grand division.").

In this case, it is clear that following the decision of the United States District Court for the Western District of Tennessee, Justice White was placed on the August 1, 1996 ballot for a "yes or no" retention vote in accordance with the dictates of the Tennessee Plan, specifically Tenn.Code Ann. § 17–4–114(b). The negative retention vote that followed obviously left a vacancy on the Court after September 1, 1994, the effective date of the Tennessee Plan. Thus, we conclude that the provisions of the Plan control. Section 17–4–114(d)(2) provides that

---

**5.** Moreover, as the Chancellor noted, there is a legal distinction between *obiter dictum* and *judicial dictum*. *Judicial dictum* refers to pronouncements in an opinion that are long regarded by the bench and bar as establishing the rule of law. *Rose v. Blewett,* 202 Tenn. at 161–62, 303 S.W.2d at 712–13. Although such language may not be necessary to the decision in a case, *judicial dictum* is controlling as precedent. *Id.*

[i]f a majority or one half (1/2) of those voting on the question vote against retaining the candidate in office, then a vacancy exists as of September 1 after the regular August election. The governor shall fill the vacancy from a group of three (3) nominees submitted by the judicial selection commission as provided in § 17–4–112.

Section 17–4–112, of course, directs the Governor to fill the vacancy by appointing one (1) of the three (3) persons nominated by the Commission. As discussed, Tenn.Code Ann. § 17–4–109(f) specifies that the only limitation on the Commission is that the nominees qualify under Article VI, section 2 of the Tennessee Constitution. In other words, no more than two justices may reside in any one grand division. Because two justices presently reside in the Middle Grand Division, the Article VI, section 2 limitation as applied in this case means that a resident of either the Eastern or Western Grand Division may apply to fill the current vacancy.

In concluding that this matter is controlled by the provisions of the Tennessee Plan, we observe that there are other statutory provisions addressing the replacement of judges and the matter of residency requirements. For instance, Tenn.Code. Ann. § 8–48–109 states that "[a]ny vacancy in the office of supreme court or court of appeals judge shall be filled by a person residing in the grand division of the state in which the vacancy occurs." Similarly, Tenn.Code Ann. § 17–1–301(b) states that "[i]f a vacancy shall occur in the office of a judge of the supreme court ... it shall be filled from the grand division of the state in which the vacancy occurs."

■ Although the provisions of Tenn Code Ann. §§ 8–48–109 and 17–1–301(b) may appear at first blush to conflict with the more recently adopted provisions of the Tennessee Plan, in interpreting statutory provisions we begin with the presumption that the acts of the General Assembly are constitutional.[6] *Vogel v. Wells Fargo Guard Servs.,* 937 S.W.2d 856 (Tenn.1996); *Petition of Burson,* 909 S.W.2d 768 (Tenn.1995); *Davis–Kidd Booksellers, Inc. v. McWherter,* 866 S.W.2d 520

(Tenn.1993). Moreover, in construing statutes, we must presume that the General Assembly knows of its prior enactments and knows of the existing state of the law at the time it passes legislation. *Owens v. State,* 908 S.W.2d 923, 926 (Tenn.1995); *Wilson v. Johnson County,* 879 S.W.2d 807, 810 (Tenn. 1994).

■ Accordingly, it is the duty of the Court to avoid a construction that will place one statute in conflict with another, and "the Court should resolve any possible conflict between the statutes in favor of each other, whenever possible, so as to provide a harmonious operation of the laws." *State ex rel. Boone v. Sundquist,* 884 S.W.2d 438, 444 (Tenn.1994). For instance "where there is a conflict between a special statute and a general statute, the special statute will be given effect." *In re Harris,* 849 S.W.2d 334, 337 (Tenn.1993); *see also Watts v. Putnam County,* 525 S.W.2d 488, 492 (Tenn.1975).

Here, the retention election of Justice White was held pursuant to the Tennessee Plan, which, as we have discussed, contains its own provision for filling a vacancy in the event a judge is not retained. Thus, the specific residency provisions of the Tennessee Plan, which reflect the provisions of the Tennessee Constitution, prevail over the general provisions in Tenn.Code Ann. §§ 8–48–109 and 17–1–301(b). Although we need not discuss the parameters of these statutory provisions, we note that they would apply in other circumstances, such as where the judicial evaluation commission does not recommend retention of a judge. *See* Tenn.Code Ann. § 17–4–114(c). This conclusion follows our familiar rule of statutory construction to "resolve any possible conflict between the statutes in favor of each other ... so as to provide a harmonious operation of the laws." *State ex rel. Boone,* 884 S.W.2d at 444.

### CONCLUSION

Accordingly, we conclude that the October 2, 1996 ruling of the Special Supreme Court with regard to the residency requirements for the present Supreme Court vacancy was

---

6. The issue of the constitutionality of Tenn.Code Ann. §§ 8–48–109 and 17–1–301(b) has not been

raised by the parties, and we do not reach that issue in this Opinion.

not before that Court for determination. We further conclude that the residency requirements for the vacancy are contained within the Tennessee Plan, specifically, Tenn.Code Ann. § 17–4–109(f). Thus, we conclude that the Commission must consider candidates for the vacancy on the Court from both the Eastern and the Western Grand Divisions of the State. The judgment of the Chancery Court for Davidson County is affirmed. Costs are taxed against the defendants.

BIRCH, C.J., and DROWOTA and REID, JJ.