IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 16, 2021 Session

## JAMES A. WELCH, ET AL. v. OAKTREE HEALTH AND REHABILITATION CENTER LLC D/B/A CHRISTIAN CARE CENTERS OF MEMPHIS, ET AL.

**Appeal from the Circuit Court for Shelby County**
**No. CT-000544-18  Jerry Stokes, Judge**

_____

**No. W2020-00917-COA-R3-CV**

_____


This appeal involves an arbitration agreement executed in connection with a patient's admission to a nursing home.  The arbitration agreement was executed by the patient's brother, who had been designated as the patient's attorney-in-fact for health care pursuant to a durable power of attorney for health care executed by the patient several years earlier. When the patient's brother filed this wrongful death suit in circuit court, the nursing home defendants filed a motion to compel arbitration.  The patient's brother then asserted that he did not have authority to bind the patient to the arbitration agreement because the patient had been mentally incompetent when he executed the durable power of attorney for health care years earlier.  The defendants argued that the trial court was not permitted to "look beyond" the durable power of attorney for health care to determine the competency of the patient at the time of its execution.  The trial court ruled that it would "look beyond" the power of attorney for health care in order to consider the patient's competency and allowed the parties to engage in discovery related to the issue of incompetence.  Discovery ensued, and the parties submitted additional evidence regarding the patient's competency.  The trial court then found by clear and convincing evidence that the patient was incompetent at the time the durable power of attorney for health care was executed.  As a result, the trial court concluded that the patient's brother lacked authority to sign the arbitration agreement as attorney-in-fact for health care.  The trial court denied the motion to compel arbitration, and the defendants appealed.  Pursuant to the Tennessee Supreme Court's decision in *Owens v. National Health Corp*., 263 S.W.3d 876 (Tenn. 2007), we hold that the trial court erred in looking beyond the durable power of attorney for health care to examine the patient's competency at the time it was executed.  We reverse the decision of the trial court and remand for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY W. ARMSTRONG, J., joined.

Craig C. Conley and Quinn N. Carlson, Memphis, Tennessee, and Christy Tosh Crider, Nashville, Tennessee, for the appellants, Oaktree Health and Rehabilitation Center, LLC d/b/a Christian Care Center of Memphis; Care Centers Management Consulting, Inc.; and Christian Care Center of Memphis, LLC.

Cameron C. Jehl, Carey L. Acerra, Deena K. Arnold, and Eric H. Espey, Memphis, Tennessee, for the appellee, James A. Welch, Next of Kin and Administrator ad Litem of Estate of David Neil Welch, deceased, and on behalf of the wrongful death beneficiaries of David Neil Welch.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Plaintiff James A. Welch filed this lawsuit as next of kin and administrator ad litem of the Estate of David Neil Welch, deceased, and on behalf of the wrongful death beneficiaries of David Neil Welch. The complaint asserted claims for health care liability, ordinary negligence, and wrongful death, arising from David Neil Welch's brief residency at a nursing home operated by the defendants, Oaktree Health and Rehabilitation Center, LLC d/b/a Christian Care Center of Memphis; Care Centers Management Consulting, Inc.; and Christian Care Center of Memphis, LLC ("Nursing Home Defendants").

The Nursing Home Defendants filed a motion to compel arbitration and stay the proceedings, asserting that Plaintiff James A. Welch had executed an arbitration agreement on behalf of his brother David Neil Welch on the date of David's admission to the Christian Care Center facility in November 2016. The Nursing Home Defendants attached the arbitration agreement executed by James as well as a "Power of Attorney for Health Care" executed by David in 2012, designating James as his attorney-in-fact for health care. James had signed the arbitration agreement in the space marked for "Resident Representative," and his "Relationship to Resident" was noted as "Brother [and] POA." The durable power of attorney for health care consisted of four pages and stated, in pertinent part, "I designate the following individual as my agent to make health-care decisions for me: Agent's Name: James A. Welch." It stated that the agent's authority to make health care decisions would take effect immediately. It was signed "David N. Welch" and dated January 30, 2012. It was also signed by two witnesses who declared under penalty of perjury that the principal was personally known to them, signed or acknowledged the document in their presence, and "appears to be of sound mind and under no duress, fraud or undue influence[.]"[1]

---

[1] The two witnesses listed home addresses in Florida but made their declarations "under penalty of

The Nursing Home Defendants filed a memorandum stating that the parties had engaged in arbitration-related discovery. They submitted deposition testimony of James Welch and Carol Reeves, the former admissions coordinator at the facility. Although Ms. Reeves could not recall anything about David's admission, she testified that family members would usually sign the admissions paperwork before the patient arrived and would have to show her any power of attorney or similar document they had. The Nursing Home Defendants also presented James's deposition testimony that he had been acting as David's attorney-in-fact for health care for years to make health care decisions for David, and no health care provider had ever refused services for David when presented with the power of attorney for health care. The Nursing Home Defendants argued that the trial court should look no further than the power of attorney for health care and that it would be inappropriate to consider the circumstances surrounding its execution according to the Tennessee Supreme Court's decision in *Owens v. National Health Corp.*, 263 S.W.3d 876 (Tenn. 2007).

James filed a response to the motion to compel arbitration, claiming that he did not have authority to enter into any type of agreement on behalf of his brother due to David's incapacity. Alternatively, he argued that the arbitration agreement was unconscionable. James contended that David was mentally incompetent to sign the durable power of attorney for health care in 2012 because David was born with Down Syndrome and could not cognitively understand what he was signing. James relied on his own deposition testimony about David's condition, along with an affidavit of a physician who had reviewed David's medical records. James argued that the Nursing Home Defendants' reliance on *Owens* was misplaced because the cited language was dicta and not binding precedent. Alternatively, they argued that the reasoning of *Owens* was wrong and that the statute relied on by the Court was inapplicable.

James submitted additional deposition testimony. During his deposition, James testified that David had resided for years in Mississippi at a group home for people with various types of learning disabilities and other conditions.[2] He said the home had work facilities and recreational facilities to provide an "active life" for residents. Prior to his residency there, David had resided with his parents in Washington. James testified that throughout David's entire life, "his cognitive ability was very, very, very not existent." He said David had attended a school as a child but that it was not a typical school. James testified that David "didn't have the ability to learn." He said that David "had the mind of a two-year-old" and could not read or write besides his name.

James testified that he "kind of took it upon [him]self" to obtain the power of

_____

perjury pursuant to Section 97-9-61, Mississippi Code of 1972." The document states, "This is a RocketLawyer.com document."

[2] James lived in Florida, worked as a real estate broker, and was in his 70s at the time of his deposition. David died at the age of 62.

attorney for health care in 2012 because David needed cataract surgery, and the Florida doctor who would be performing the surgery "indicated that I would have to have his medical power of attorney to get the procedure scheduled and done." James testified that he found the form online and learned that in Mississippi, where David resided, the document did not have to be notarized but did require a witness. James said he printed the form and had David sign his name on the final page but that David "had absolutely no concept of what this was all about." According to James, "I just said, 'Write your name here, David.'" James testified that the two witnesses who signed the document under penalty of perjury stating that David was personally known to them and appeared to be of sound mind were his wife, who was now deceased, and his long-time neighbor. James said he presented the power of attorney for health care at the eye clinic but stated, "This is a power of attorney that I printed off online. It's there. It is what it is. I have absolutely no concept of whether or not this is a legal deal or not, but there it is." James said he later used the power of attorney for health care when David had surgery for bone-anchored hearing aids, and he had presented it when David was admitted to a couple of hospitals. However, he said that any time he had presented the document, he stated, "I have this. I don't know how legal it is. I don't know how he would be . . . have ever been considered competent enough to give it to me, but let's get David taken care of." He testified that no health care provider ever refused to provide services for David after he presented the document. James testified that David was admitted to Christian Care Center in 2016 with diagnoses of Lymphedema (swelling of the lower legs) and Down Syndrome. James and his sister had toured various facilities and ultimately decided on Christian Care Center.[3] James also submitted deposition testimony of Ms. Reeves, who stated that although she had not met David at the time of the admissions process, the facility would have been aware of his diagnosis of Down Syndrome by that time.

James submitted the affidavit of a physician who had reviewed David's medical records in order to opine as to his mental competency throughout his adult life and his ability to comprehend the power of attorney for health care for purposes of this lawsuit. The physician's affidavit states that David had resided at the group home in Mississippi for 28 years. He stated that Down Syndrome results in cognitive impairments that are present throughout the lifetime of the individual. According to the doctor, records from the group home showed that David "exhibited clear indications of impairments, limitations, and behaviors consistent with Down Syndrome throughout his residency, as well as indicate that [David] had a history of limited cognitive and mental capabilities." For example, the records contained multiple entries in which David did not write or spell his name correctly. The doctor also described numerous behavioral incidents that demonstrated, in the doctor's opinion, "a person [] who is unable to understand in a reasonable manner the nature and consequences of his/her actions." The doctor also reviewed the records from the nursing home and concluded that they showed similar limitations and impairments upon his

_____

[3] David had also executed a durable power of attorney for financial management in 2006, designating his sister as his attorney-in-fact.

- 4 -

admission in 2016. Finally, the doctor discussed James's deposition testimony that David was childlike and unable to learn. Thus, the doctor opined, "to a reasonable degree of medical certainty, that David Neil Welch was not able to understand and appreciate the nature, scope, effect, and implications of power of attorney documents during his adult life," including the document he executed in 2012. The doctor opined that David "was not competent" to execute the power of attorney for health care.

After a hearing on the motion to compel arbitration, the trial court entered an order stating that it would "look beyond" the power of attorney for health care to determine whether David was competent when he executed the document in 2012. However, the trial court gave defense counsel an opportunity to depose the doctor who opined as to David's competency and continued the hearing date. During his deposition, the doctor testified that a diagnosis of Down Syndrome does not necessarily equate to a patient being incompetent. He acknowledged that David had a job in the cafeteria at the group home and signed his own consent forms for vaccinations. Still, from his review of the medical records and testimony, the doctor believed that David was not "competent to make higher-level decisions." After the deposition was taken, the Nursing Home Defendants filed another reply, arguing that the doctor's testimony was insufficient to establish that David was incompetent at the time of execution of the document in 2012. In response, James maintained that the doctor's opinion was sufficient.

Following another hearing, the trial court entered an order denying the Nursing Home Defendants' motion to compel arbitration. The trial court found by clear and convincing evidence that David was incompetent and unable to read or appreciate the gravity of signing the power of attorney for health care in 2012. As a result, it found that the power of attorney for health care was invalid and that there was no valid agreement to arbitrate. The court did not reach the issue of unconscionability. The Nursing Home Defendants timely filed a notice of appeal.

## II.   ISSUES PRESENTED

The Nursing Home Defendants present the following issues, as we perceive them, for review on appeal:

1. Whether the trial court erred in looking beyond the power of attorney for health care to determine whether David was competent to execute the document in 2012; and
2. Whether the trial court erred in finding there was clear and convincing evidence that David was incompetent when he signed the power of attorney for health care.

For the following reasons, we reverse the decision of the circuit court and remand for further proceedings.

- 5 -

## III. DISCUSSION

The first issue we must address is whether it was permissible for the trial court to look beyond the power of attorney for health care and examine the circumstances surrounding the execution of the document in 2012 in order to determine whether David was competent at that time. The parties dispute whether the answer to this question is controlled by the Tennessee Supreme Court's decision in *Owens v. National Health Corp.*, 263 S.W.3d 876 (Tenn. 2007). As such, we start with a discussion of *Owens*.

*Owens* was a nursing home arbitration case in which the Tennessee Supreme Court examined numerous issues that often arise in the context of such cases. Factually, in *Owens*, the patient had executed a durable power of attorney for health care naming an attorney-in-fact on August 5, 2003. *Id.* at 879. That document stated that it was to be "construed and interpreted as a Durable Power of Attorney for Health Care and is intended to comply in all respects with the provisions of Tennessee Code Annotated, § 34-6-201 *et seq.*" *Id.* at 880. Three weeks after the power of attorney for health care was executed, on August 26, 2003, the patient was admitted to a nursing home, at which time the attorney-in-fact signed the admissions documents, including an arbitration agreement, as her representative. *Id.* at 880-81.

Before the Tennessee Supreme Court, the "primary issue" was "whether a durable power of attorney for health care authorized the attorney-in-fact to enter into an arbitration agreement as part of a contract admitting the principal to a nursing home and thereby to waive the principal's right to trial by jury." *Id.* at 879. On that issue, the Court concluded that "the power of attorney authorized the attorney-in-fact to enter into the arbitration agreement on behalf of the principal." *Id.* However, the case also presented "secondary issues relating to the arbitration agreement," including whether the case was governed by the state or federal arbitration act, whether the arbitration agreement was unenforceable because a material term was incapable of performance, whether the arbitration agreement violated federal law, and whether pre-dispute arbitration agreements in nursing home contracts violate public policy. *Id.* Also, the plaintiff had argued that the agreement was unconscionable and that "she should be permitted to conduct discovery concerning the issues arising from the arbitration agreement." *Id.* at 881-82. Ultimately, the Tennessee Supreme Court resolved most of the issues presented but remanded the case to the trial court for further proceedings on the issue of whether the arbitration agreement was unconscionable and thus unenforceable. *Id.* at 879. The Court stated,

> We are unable to resolve the question of whether the arbitration agreement is unconscionable due to the limited nature of the factual record. We therefore conclude that the case should be remanded to the trial court for further proceedings on that issue. The trial court, in its discretion, may allow the parties to conduct discovery. *See Berger v. Cantor Fitzgerald Sec.*, 942 F.Supp. 963, 966 (S.D.N.Y.1996) (allowing discovery concerning arbitration

agreement and enforceability issues). We express no opinion, however, as to the ultimate resolution of the unconscionability issue.

*Id.* at 889. The Court's opinion was issued on November 8, 2007.

On February 7, 2008, the Court entered an order granting in part and denying in part a petition to rehear filed by the defendants.[4] *Id.* at 890-91. The order stated, in part:

In their petition, the appellees allege that the Court improperly allowed discovery as to the principal's competence to sign the power of attorney.

Upon due consideration, the Court concludes that appellees' petition to rehear is well-taken as to this issue and should therefore be granted. The petition to rehear is denied as to the remainder of the issues.

It appearing to the Court from appellees' Petition to Rehear and appellant's response that footnote 4 of its Opinion filed November 8, 2007, should be modified,

IT IS, THEREFORE, ORDERED ADJUDGED AND DECREED that the attached Opinion be and the same is hereby substituted for that Opinion filed in this cause on November 8, 2007, without change to this Court's judgment entered contemporaneously with the filing of the original Opinion on November 8, 2007, and without the further taxing of costs.

*Id.* at 891. Although the original text of footnote four is unknown to this Court, footnote four of the modified opinion now states, in its entirety:

The plaintiff also questions whether [the patient] was incompetent to sign the nursing-home agreement when [the attorney-in-fact] executed the contract pursuant to the power of attorney. The plaintiff asserts that the trial court should have permitted discovery regarding the circumstances surrounding the execution of both the nursing-home contract and the power of attorney, which was executed only twenty-one days later. We agree that discovery concerning whether [the patient] was incompetent to sign the nursing-home agreement should be permitted on remand. Discovery should not be permitted, however, concerning the validity of the power of attorney or the circumstances surrounding its execution. *See* Tenn. Code Ann. § 34-6-208 (providing immunity to health care providers who rely on decisions "made by an attorney in fact who the health care provider believes in good

---

[4] The "Order Granting in Part and Denying in Part Appellees' Petition to Rehear" appears with the opinion in the South Western Reporter and also at the end of the opinion on Westlaw.

- 7 -

faith is authorized" to make health care decisions).[5]

*Id.* at 889 n.4.

This Court considered an argument relying on the footnote from *Owens* in *Duke v. Kindred Healthcare Operating, Inc.*, No. W2010-01534-COA-R3-CV, 2011 WL 864321 (Tenn. Ct. App. Mar. 14, 2011). In that case, nursing home defendants likewise argued that "they were entitled to rely upon the 'facially valid power of attorney' and that the trial court should not have considered whether [the patient] was competent to execute it," based on footnote 4 in *Owens. Id.* at *10. However, the particular document signed by the patient in *Duke* was a "General Durable Power of Attorney," *id.* at *1, not a durable power of attorney *for health care.* As such, it was governed by the Uniform Durable Power of Attorney Act, Tenn. Code Ann. § 34-6-*101*, et seq., and not the Durable Power of Attorney *for Health Care* Act, Tenn. Code Ann. § 34-6-*201*, et seq. *Id.* at *10. Notably, we pointed out that "[t]he Uniform Durable Power of Attorney Act, Tenn. Code Ann. § 34-6-101, et seq., contains no provision similar to the one cited by the Court in *Owens*." *Id.* In conclusion, we stated, "Because, as Defendants concede, Tennessee Code Annotated section 34-6-208 governs durable powers of attorney for healthcare, and it is inapplicable to the general durable power of attorney executed by Mr. Duke, the *Owens* decision does not prevent the trial court from considering the validity of the power of attorney in this case." *Id.* at *11.

Here, the trial court did not mention *Owens* in its orders. It simply stated that the court had decided to look beyond the power of attorney for health care to determine whether David was competent to execute that document. Thus, it is not clear to this Court why the trial court made this decision. On appeal, James argues that *Owens* does not

---

[5] The statute cited by the Court, Tenn. Code Ann. § 34-6-208, is part of the Durable Power of Attorney for Health Care Act and provides, in relevant part:

(a) Subject to any limitations stated in the durable power of attorney for health care, and, subject to subsection (b) and §§ 34-6-210 -- 34-6-212, a health care provider is not subject to criminal prosecution, civil liability or professional disciplinary action except to the same extent as would be the case if the principal, having had the capacity to give informed consent, had made the health care decision on the principal's own behalf under like circumstances, if the health care provider relies on a health care decision and both of the following requirements are satisfied:
(1) The decision is made by an attorney in fact who the health care provider believes in good faith is authorized under this part to make the decision; and
(2) The health care provider believes in good faith that the decision is not inconsistent with the desires of the principal as expressed in the durable power of attorney for health care or otherwise made known to the health care provider, and, if the decision is to withhold or withdraw health care necessary to keep the principal alive, the health care provider has made a good faith effort to determine the desires of the principal to the extent that the principal is able to convey those desires to the health care provider and the results of the effort are made a part of the principal's medical records.

control our decision, for several reasons.

First, James contends that the discussion of this issue in *Owens*, in the context of its instructions on remand, is non-binding dicta. This Court rejected a similar argument, regarding instructions on remand, in *In re Estate of Dattel*, No. W2019-00800-COA-R3-CV, 2020 WL 3169501 (Tenn. Ct. App. June 12, 2020) *perm. app. denied* (Tenn. Oct. 9, 2020). We noted that the final issue presented on appeal in *In re Estate of Dattel* had already been "addressed" by the Tennessee Supreme Court in *In re Estate of Brock*, 536 S.W.3d 409, 410 (Tenn. 2017). *Id.* at *6. We went on to quote the final paragraph of the *Brock* opinion addressing what would occur "on remand." *Id.* We then addressed the argument on appeal that the quoted language from *Brock* was not binding:

> The Proponents contend that the main issue in *Brock* involved the contestants' standing and that the portion of the Supreme Court's opinion directing all of the decedent's testamentary instruments to be submitted together for the will contest "can at best be classified as *dicta*." The contestants' standing was at issue in *Brock*, but we do not agree with the Proponents that the Court's opinion regarding the instruments to be considered in determining the decedent's valid last will and testament on remand should be disregarded as mere dicta. "Dictum" has been described as "a remark or opinion uttered by the way" that "has no bearing on the direct route or decision of the case but is made as an aside." *Staten v. State*, 232 S.W.2d 18, 19 (Tenn. 1950). The portion of the *Brock* Court's opinion directing all of the decedent's wills to be submitted together for an adjudication of the decedent's final wishes on remand can certainly not be said to have no bearing on the route or direction of the case. In a more recent discussion of the meaning of dictum, our Supreme Court has written the following:
>
>> [T]rial courts must follow the directives of superior courts, particularly when the superior court has given definite expression to its views in a case after careful consideration. *Taylor v. Taylor*, 162 Tenn. 482, 488-89, 40 S.W.2d 393, 395 (1931); *Rose v. Blewett*, 202 Tenn. 153, 161-62, 303 S.W.2d 709, 712-13 (1957); *Davis v. Mitchell*, 27 Tenn. App. 182, 223-24, 178 S.W.2d 889, 905-06 (1943). Accordingly, inferior courts are not free to disregard, on the basis that the statement is *obiter dictum*, the pronouncement of a superior court when it speaks directly on the matter before it, particularly when the superior court seeks to give guidance to the bench and bar. To do otherwise invites chaos into the system of justice.
>
> *Holder v. Tenn. Judicial Selection Comm'n*, 937 S.W.2d 877, 881-82 (Tenn.

- 9 -

1996) (footnote omitted). The *Brock* Court was speaking directly upon the matter before it and was providing guidance to the bench and bar when it directed all of the decedents' testamentary instruments to be submitted together for adjudication in the will contest.

*Id.* at *7.

In the referenced *Holder* opinion, a chancery court had concluded that a pronouncement in a Special Supreme Court decision "was *obiter dictum*" and "while [the opinion was] accorded persuasive authority, [it was] not binding on [the] Court." 937 S.W.2d at 880-81. The Tennessee Supreme Court stated that it "need not decide" whether the prior opinion was obiter dictum that was binding on the trial court as precedent, but observed that, in any event, "trial courts must follow the directives of superior courts, particularly when the superior court has given definite expression to its views in a case after careful consideration." *Id.* at 881 (citations omitted). We do the same here. It is not necessary for this Court to decide whether the discussion of this issue in *Owens* would be binding precedent. Either way, this Court is not free to disregard the discussion in *Owens* directly addressing the issue before us. *See, e.g.*, *State v. Walls*, 537 S.W.3d 892, 905 n.7 (Tenn. 2017) (conceding that its decision on an issue was "not technically necessary to resolve this appeal" but noting that "clarification of this point, even in dicta, will provide guidance to defense lawyers, prosecutors, trial judges, and members of the Court of Criminal Appeals," as "'inferior courts are not free to disregard, on the basis that the statement is *obiter dictum*, the pronouncement of a superior court when it speaks directly on the matter before it'") (quoting *Holder*, 937 S.W.2d at 882); *Monday v. Thomas*, No. M2012-01357-COA-R3-CV, 2014 WL 1852958, at *3 n.2 (Tenn. Ct. App. May 5, 2014) (noting that a statement in a Tennessee Supreme Court case "arguably may be considered dicta" but quoting the language of *Holder* that "inferior courts are not free to disregard, on the basis that the statement is *obiter dictum*, the pronouncement of a superior court when it speaks directly on the matter before it"); *Davis v. Davis*, No. M2003-02312-COA-R3-CV, 2004 WL 2296507, at *6 (Tenn. Ct. App. Oct. 12, 2004) ("Once the Tennessee Supreme Court has addressed an issue, its decision regarding that issue is binding on the lower courts. . . . The court has even admonished us that we are not free to disregard its dictum when the court is speaking directly on the matter before it and it is seeking to give guidance to the bench and bar.") (citing *Holder*, 937 S.W.2d at 881-82).

As it is, we are guided by the conclusion from *Owens*, upon the petition to rehear, that the Court had "improperly allowed discovery as to the principal's competence to sign the power of attorney." 263 S.W.3d at 891. Even though the plaintiff had argued that "the trial court should have permitted discovery regarding the circumstances surrounding the execution of . . . the power of attorney," the Tennessee Supreme Court determined that "[d]iscovery should not be permitted [] concerning the validity of the power of attorney or the circumstances surrounding its execution." *Id.* at 889 n.4 (citing Tenn. Code Ann. § 34-6-208 (providing immunity to health care providers who rely on decisions "made by an

- 10 -

attorney in fact who the health care provider believes in good faith is authorized" to make health care decisions)).

Although the argument was not raised in his brief on appeal, James suggested at oral argument that the statute cited in *Owens*, Tenn. Code Ann. § 34-6-208, would not apply to the power of attorney for health care in this case because "this was a Mississippi power of attorney." Even though the technical record in this case exceeds one thousand pages, it contains no argument or analysis from either party regarding this issue. There is only one brief mention of the issue in a transcript, wherein counsel for James simply stated, "I will submit to Your Honor this power of attorney wasn't executed pursuant to the Tennessee Durable Power of Attorney For Healthcare Act. It was a Mississippi power of attorney that was executed in Florida. So I just wanted to put that thought with Your Honor." Neither the parties nor the trial court discussed any statute or caselaw, from Tennessee or Mississippi, relevant to this issue.

We note that the power of attorney for health care executed by David never mentioned any controlling law that would apply to it. The only mention of any state law is in the witness statements that were made under penalty of perjury pursuant to a Mississippi statute, and the witnesses listed their home addresses in Florida. Tennessee's Durable Power of Attorney for Health Care Act provides:

> A durable power of attorney for health care that is executed outside of this state by a nonresident of this state at the time of execution shall be given effect in this state if that durable power of attorney for health care is in compliance with either this chapter or the laws of the state of the principal's residence.

Tenn. Code Ann. § 34-6-215. Neither party suggests that the power of attorney for health care failed to comply with Tennessee law or Mississippi law.[6]

Nevertheless, we conclude that Tennessee's Durable Power of Attorney for Health Care Act does not apply to this document, for a different reason. The durable power of attorney for health care in this case must be considered under a newer statutory scheme, the Tennessee Health Care Decisions Act, Tenn. Code Ann. § 68-11-1801, et seq. *See* Sandra S. Benson, *Does Your Agent Have the Power? Extending the Power of Agents to Bind Principals to Arbitration*, 44 Tenn. B.J. 19, 20 (June 2008) (explaining that there are "alternative statutes that can apply to health care directives" in Tennessee, as "[t]he older statute is The Durable Power of Attorney for Health Care Act (DPAHCA) passed in 1990 and the newer act is The Tennessee Health Care Decisions Act (HCDA) passed in 2004").

---

[6] During his deposition, James testified about printing a form from the Internet, and he stated, "I found out that in Mississippi, which is where he resided, that it didn't require notarizing. I could simply fill it out and have a witness sign it. . . . So I did that."

- 11 -

"The Tennessee Health Care Decisions Act was drafted by a volunteer group of health care administrators, clinicians and attorneys, many of whom had experienced firsthand the difficulties of securing valid, executed directives or obtaining consent to treatment for those without such directives." Charles M. Key & Gary D. Miller,[7] *The Tennessee Health Care Decisions Act A Major Advance in the Law of Critical Care Decision Making*, 40 Tenn. B.J. 25, 28 (August 2004). Their intention was "to simplify formal requirements and thus make it easier for patients to provide their instructions by broadening the spectrum of forms patients could use." *Id.* According to one of those drafters,

> In an attempt to remove some of the formal impediments to persons willing to provide advance direction to their health care providers, the General Assembly in 2004 adopted the Tennessee Health Care Decisions Act (HCDA). The HCDA employs simplified terminology and relaxes a number of the formal requisites for advance health care directives. Under the HCDA, any adult having the capacity to participate in his or her own health care decision-making may appoint an "agent" to make health care decisions and may give other written instructions to health care providers. The sole requirements to survive incapacity are that the directive be in writing and signed in the presence of either two qualified witnesses or a notary. If witnesses are used, the statute prescribes their qualifications and the content of their written attestation.

> The HCDA did not repeal the pre-existing living will and durable power of attorney for health care statutes. Not only does it preserve those historic forms by its own basic terms, but the old statutes themselves remain effective under redundant savings provisions. For example, Tenn. Code Ann. § 68-11-1803(j) provides:

>> Any living will, durable power of attorney for health care, or other instrument ... complying with the terms of title 32, chapter 11, and a durable power of attorney for health care complying with the terms of title 34, chapter 6, part 2, shall be given effect and interpreted in accord with those respective acts. Any advance directive that does not evidence an intent to be given effect under those acts but that complies with this part may be treated as an advance directive under this part.

> As a result, many Tennessee lawyers have continued to use their old living will and durable power of attorney for health care forms, even after the HCDA's enactment.

---

[7] "Miller chaired and Key served as a member of the workgroup that developed the Tennessee Health Care Decisions Act during the latter half of 2003." 40 Tenn. B.J. at 31 n.aa1.

Charles M. Key, *Who Will Decide? Helping Your Clients with End-of-Life Directives*, 42 Tenn. B.J. 12, 13-14 (Dec. 2006).

"The Tennessee Health Care Decisions Act outlines how a competent adult may execute an 'advance directive' for health care that authorizes an 'agent' to make health care decisions should the adult lose the capacity to do so." *Barbee v. Kindred Healthcare Operating, Inc*., No. W2007-00517-COA-R3-CV, 2008 WL 4615858, at *10 (Tenn. Ct. App. Oct. 20, 2008) (citing Tenn. Code Ann. § 68-11-1803(b) (2006)). Under the HCDA, an "'[a]dvance directive' means an individual instruction or a written statement relating to the subsequent provision of health care for the individual, including, but not limited to, a living will or a durable power of attorney for health care." Tenn. Code Ann. § 68-11-1802(a)(1). When the HCDA was adopted in 2004, a new section was also added to the Durable Power of Attorney for Health Care Act, stating:

> (a) A durable power of attorney for health care entered into before July 1, 2004, under this part shall be given effect and interpreted in accord with this part.
> (b) A durable power of attorney for health care entered into on or after July 1, 2004, that evidences an intent that it is entered into under this part shall be given effect and interpreted in accord with this part.
> (c) A durable power of attorney for health care entered into on or after July 1, 2004, that does not evidence an intent that it is entered into under this part may, if it complies with the Tennessee Health Care Decisions Act, compiled in title 68, chapter 11, part 18, be given effect as an advance directive under that act.

Tenn. Code Ann. § 34-6-217. According to those involved with the process,

> Early drafts of the HCDA provided for the repeal of the old living will and durable health care power of attorney laws with grand-fathering provisions and express recognition that any forms drafted in compliance with the old laws would be recognized as advance directives; however, following an expression of a concern by some members of the bar that such repeal would create confusion, the statute was redrafted to leave the old laws in place. The HCDA adopts a new section of Tenn. Code Ann. Title 34, Chapter 6 providing that durable powers of attorney for health care executed prior to July 1, 2004 will be governed by the old law, as will instruments executed on or after July 1, 2004 that "evidence an intent" to be governed by the old law. Only those that do not evidence an intent to be governed by the old law will be interpreted and applied under the new law.

Key & Miller, 40 Tenn. B.J. at 28 n.22.

The power of attorney for health care in *Owens* specifically stated that it was "intended to comply in all respects with the provisions of Tennessee Code Annotated, § 34-6-201 *et seq.*" 263 S.W.3d at 880. Looking to the power of attorney for health care in this case, it does not cite to any particular governing law. As such, so long as it complies with the HCDA, it will "be given effect as an advance directive under that act." Tenn. Code Ann. § 34-6-217(c); *see also* Key & Miller, 40 Tenn. B.J. at 31 (advising that "[a] careful review of [non-statutory] forms will be needed to determine whether they may evidence an intent to be governed under pre-existing Tennessee statutes, and if not, whether they may have validity under the HCDA").

Like the older Durable Power of Attorney for Health Care Act, the newer Health Care Decisions Act provides, with nearly identical language:

> An advance directive that is executed outside of this state by a nonresident of this state at the time of execution shall be given effect in this state, if that advance directive is in compliance with either this part or the laws of the state of the principal's residence.

Tenn. Code Ann. § 68-11-1803(h); *compare* Tenn. Code Ann. § 34-6-215. Again, there is nothing in the record to suggest that this document did not comply with Mississippi law. In any event, however, we conclude that it complies with Tennessee's HCDA, which provides:

> The advance directive must be in writing and signed by the principal. The advance directive must either be notarized or witnessed by two (2) witnesses. . . . For the purposes of this section, a witness shall be a competent adult, who is not the agent, and at least one (1) of whom is not related to the principal by blood, marriage, or adoption and would not be entitled to any portion of the estate of the principal upon the death of the principal under any will or codicil made by the principal existing at the time of execution of the advance directive or by operation of law then existing. A written advance directive shall contain an attestation clause that attests that the witnesses comply with the requirements of this subsection (b).

Tenn. Code Ann. § 68-11-1803(b). This document was signed by the principal and two witnesses with the required attestation clauses. Therefore, it must be given effect in this state pursuant to the HCDA.

Because the document in this case is subject to the HCDA rather than the older Durable Power of Attorney for Health Care Act, we recognize that the particular statute cited by *Owens* does not apply here. That statute, Tenn. Code Ann. § 34-6-208, provided, in pertinent part:

- 14 -

(a) Subject to any limitations stated in the durable power of attorney for health care, and, subject to subsection (b) and §§ 34-6-210 -- 34-6-212, a health care provider is not subject to criminal prosecution, civil liability or professional disciplinary action except to the same extent as would be the case if the principal, having had the capacity to give informed consent, had made the health care decision on the principal's own behalf under like circumstances, if the health care provider relies on a health care decision and both of the following requirements are satisfied:

(1) The decision is made by an attorney in fact who the health care provider believes in good faith is authorized under this part to make the decision; and

(2) The health care provider believes in good faith that the decision is not inconsistent with the desires of the principal as expressed in the durable power of attorney for health care or otherwise made known to the health care provider, and, if the decision is to withhold or withdraw health care necessary to keep the principal alive, the health care provider has made a good faith effort to determine the desires of the principal to the extent that the principal is able to convey those desires to the health care provider and the results of the effort are made a part of the principal's medical records.

However, the newer HCDA contains a very similar provision:

(a) A health care provider or institution acting in good faith and in accordance with generally accepted health care standards applicable to the health care provider or institution is not subject to civil or criminal liability or to discipline for unprofessional conduct for:

(1) Complying with a health care decision of a person apparently having authority to make a health care decision for a patient, including a decision to withhold or withdraw health care;

(2) Declining to comply with a health care decision of a person based on a belief that the person then lacked authority; or

(3) Complying with an advance directive and assuming that the directive was valid when made and that it had not been revoked or terminated.

Tenn. Code Ann. § 68-11-1810(a). Thus, we believe that the Tennessee Supreme Court's application of Tennessee Code Annotated section 34-6-208 in *Owens* requires the same result with respect to section 68-11-1810 in this case, involving a power of attorney for health care and the newer HCDA.

At least with regard to Tennessee Code Annotated section 34-6-208, James had alternatively argued that the statute would not apply under the facts of this case because the nursing home did not act in "good faith." Because section 68-11-1810 also requires good faith, we have considered James's argument. However, the record before us simply

does not support his assertion that the nursing home did not proceed in good faith. James first points to the fact that the nursing home was aware of David's diagnosis of Down Syndrome. However, we note that the HCDA specifically addresses capacity and provides that "[a]n individual is presumed to have capacity to make a health care decision [and] *to give or revoke an advance directive*[.]" Tenn. Code Ann. § 68-11-1812(b) (emphasis added). "The force of this presumption does not wane as a person ages[.]" *Cabany v. Mayfield Rehab. & Special Care Ctr.*, No. M2006-00594-COA-R3-CV, 2007 WL 3445550, at *5 (Tenn. Ct. App. Nov. 15, 2007). We also note the testimony of the expert witness in this case that a diagnosis of Down Syndrome does not equate to a finding of mental incompetency and that "people with Down syndrome have a spectrum of virtually being fully independent to needing almost total care throughout their life." Thus, the fact that the nursing home coordinator accepted a power of attorney for health care executed by a person the facility knew to have Down Syndrome does not mean that it did not act in good faith.

James also suggests that the circumstances surrounding his presentation of the power of attorney for health care show that he expressed doubt as to the validity of the document, and therefore, the facility did not exhibit good faith in relying on it. Accordingly, we will review his testimony about the admissions process in some detail. During his deposition in September 2019, James testified that when the admissions paperwork was signed on November 14, 2016, he was present along with his wife and his sister. David remained in the hospital at that time and had not met the admissions coordinator who handled the paperwork. James testified that they were given a brief tour of the facility and then signed the paperwork, with the signing process lasting about thirty minutes. When asked if he brought the power of attorney for health care with him, James testified, "I believe that I did." He recalled the admissions coordinator being "in kind of a hurry-up process" because she had another appointment or had to go somewhere but added, "That's all I remember, and it seemed like she just went through the papers." He testified that "she had [my sister] signing some and me signing some, as I recall. I – my mind was really on David more so than the paperwork being put in front of me." He testified that the admissions coordinator may have showed them a video about the facility but he could not remember. He had "no idea" if she offered them food or drink. When asked if the coordinator went through the stack "document by document," he said, "I'm sure that she had a stack of it in front of her, and – and she went through them. How much explanation she gave to each one, I can't remember."[8] When asked if he had an opportunity to ask questions he said, "I'm sure that the opportunity to ask questions is always there," but he could not recall if he asked any questions. He did recall his sister asking a question about social security checks but added, "that's all I can remember." When shown various documents from the admissions paperwork, James could not recall any of the documents

---

[8] James would later admit that the coordinator "may well have given some explanation to these things" and "[t]he degree of attention I was paying to it, I can't recall, but obviously, from what I've seen today, I signed them."

but admitted that his signature was on each of them. Regarding the arbitration agreement itself, he stated, "To tell you the truth, I don't remember the document. Again, in looking at it, it does have my signatures on it." James acknowledged that he was given a copy of the admissions paperwork, which he still had at his home in Florida. James insisted that he sincerely could not recall anything else about the admissions process that they had not already covered in the deposition, stating that he was "stressed and preoccupied" during that time period and that "[t]he admission process is somewhat of a – a gray area for me."

Then, during examination by his own attorney, the following exchange occurred:

Q. Okay. And you mentioned on direct-examination, I think, that you told the representative of Christian Care that you had a power of attorney.
Do you recall telling the Christian Care representative about that?

A. I -- I recall any time that I had this -- was asked for a power of attorney, I told people that I had this, I questioned -- I don't know whether it's valid or not, but, nonetheless, I have it. You know, I let everybody know that there may be some issues with this --

Q. Okay.

A. -- whether that was Christian Care Center, or hospitals, or the ear doctor, or the eye doctor or anybody that I had occasion to discuss this with.

Q. So in this --

A. I've never told anybody this is an absolute power of attorney that gives me right to do anything. I said, "Yeah, here it is."

Q. Okay. So in this instance with the Christian Care representative, did you tell her that you were not sure whether or not this power of attorney was valid?

A. Yes.

Q. Okay. And is that because you don't believe that your brother was competent to execute it?

A. That's correct.

MR. CONLEY: Objection.

Q. Okay. Do you think your brother had the capacity, had he known about the arbitration agreement, to revoke it, to cancel it?

MR. CONLEY: Objection.

A. No.

Counsel for the Nursing Home Defendants then asked:

Q. Do you specifically recall yourself telling the admissions person at Christian Care that you had some questions about the validity of the health care power of attorney?

- 17 -

A. I do.

Q. You do recall that –

A. I --

Q. -- specifically?

A. I specifically remember that. I remember that -- anywhere I've shown this thing, I said, "Hey, I've got this power of attorney. It's got David's signature on it. I printed it offline and filled it out and there it is, and I don't know how valid it is."

Q. And you specifically recall that conversation on the day that you had your brother admitted to Christian Care?

A. Yes.

Q. Were there any -- I thought when I asked you about could you tell me of any and all conversations you had or said, I don't remember that being said in your earlier testimony.

MS. ARNOLD: Object to the form.

A. Well, if it wasn't said in my earlier testimony, it certainly was said at the time, because I know that any time I showed that, I made it very clear that --

Q. Is there --

A. I wasn't --

Q. Is there anything else you recall about that admission process that hasn't been discussed previously?

A. Not that I can think of, no.

Q. There's a lot you don't recall about it?

A. There is a lot I don't recall about it.

Q. Right. And I think in your discovery responses, you don't even recall signing documents?

A. I really don't.

MS. ARNOLD: Object to the form.

A. I honestly -- I don't recall signing all these documents, but I -- I signed them.

According to James, these facts show that the Nursing Home Defendants "knew or certainly should have known" that David lacked capacity to execute the power of attorney for health care in 2012, and also knew or should have known that he himself lacked authority to sign the arbitration agreement during the admissions process. We disagree. These facts simply fail to demonstrate that the nursing home did not act in good faith within the meaning of the statute.

Finally, James suggests that the *Owens* decision wrongly applied section 34-6-208 to issues involving the enforceability of an arbitration agreement because the statute is limited to protection from civil liability, criminal prosecution, or professional discipline. However, this Court is "bound to follow [Tennessee Supreme Court decisions] if they are

on point." *Publix Super Markets, Inc. v. Tenn. Dep't of Lab. & Workforce Dev., Lab. Standards Div.*, 402 S.W.3d 218, 230 (Tenn. Ct. App. 2012). It is not for this Court to say whether the statute was properly applied in *Owens*.

## IV. CONCLUSION

In summary, the Tennessee Supreme Court concluded in *Owens* that it had "improperly allowed discovery as to the principal's competence to sign the power of attorney" for health care, and it determined that discovery should not be permitted "concerning the validity of the power of attorney or the circumstances surrounding its execution." 263 S.W.2d at 891, 889 n.4. As such, we conclude that the trial court in this case erred in looking beyond the power of attorney for health care to consider the circumstances surrounding its execution and whether the principal was competent to sign the power of attorney for health care.[9] The decision of the circuit court is reversed and remanded for consideration of the alternative issue presented below regarding whether the arbitration agreement was unconscionable. Costs of this appeal are taxed to the appellee, James A. Welch, as next of kin and administrator ad litem of the Estate of David Neil Welch, deceased, and on behalf of the wrongful death beneficiaries of David Neil Welch, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE

---

[9] We note two cases in which this Court has considered issues regarding the competency of a patient at the time he or she executed a power of attorney for health care. However, neither of those cases involved any discussion of the footnote from *Owens*. In fact, the first opinion was issued by this Court less than a month after the *Owens* decision but before the Court granted in part the petition to rehear on February 7, 2008. *See Raines v. Nat'l Health Corp.*, No. M2006-1280-COA-R3-CV, 2007 WL 4322063, at *7 (Tenn. Ct. App. Dec. 6, 2007) (remanding for the trial court to consider the alternative issue of whether the patient was "mentally incapable of executing the power of attorney"). The second case, *Estate of Czoka v. Life Care Center of Gray*, No. E2020-00995-COA-R9-CV, 2021 WL 1814079, at *7 (Tenn. Ct. App. May 6, 2021), was a Rule 9 appeal in which our review was limited to the single issue of "whether the trial court correctly concluded that Decedent possessed the requisite mental capacity at the time she executed the powers of attorney." There is nothing to indicate that the parties raised any issue regarding *Owens*, its discussion of section 34-6-208, or the similar provision in the HCDA. Because the Supreme Court's guidance on this issue was limited to a footnote and an order granting in part a petition to rehear, and in light of these two decisions, we encourage the Court to consider this issue in order to definitively resolve the matter and to give clarity and guidance to all involved in these cases.